FILED

2010 Dec-30  PM 04:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

```
REGINALD JONES,              }
                            }
     Plaintiff,             }
                            }       CIVIL ACTION NO.
v.                          }       09-AR-1321-S
                            }
UPS GROUND FREIGHT, INC.,   }
                            }
     Defendant.             }
```

**MEMORANDUM OPINION**

Before the court is the motion of defendant, UPS Ground Freight, Inc. ("UPS"), for summary judgment (Doc. 22) as to all claims brought by plaintiff, Reginald Jones ("Jones"). Jones has responded (Doc. 29), and UPS has replied (Doc. 30). Jones, who is black and a former employee of UPS, asserts the following claims: (1) racially hostile work environment under Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981 ("§ 1981"); (2) constructive discharge under Title VII and § 1981; (3) intentional infliction of emotional distress under Alabama law; and (4) negligent hiring, supervision, training, and retention under Alabama law. Because of the procedural posture, all facts are viewed in the light most favorable to Jones. For the reasons that follow, UPS's motion for summary judgment will be granted.

**FACTS**

UPS is in the business of transporting cargo by motor carrier.

(Doc. 24-2 at 10.)[1]  Jones was employed by UPS as a road driver in its Truckload Division from May 1, 2007 until May, 2008.  (*Id.* at 10-15.) While so employed, Jones lived in Birmingham, Alabama, but was dispatched out of a UPS shipping terminal located in Fulton, Mississippi ("the Fulton Terminal").  (*Id.* at 4-5, 10.)  The Fulton Terminal ships goods exclusively for a plumbing hardware manufacturer, Ferguson Enterprises ("Ferguson"), and is located on Ferguson owned property.  (*Id.* at 11.)  Jones's delivery routes included locations throughout the Southeast and Midwest.  (*Id.*)

There are no UPS Truckload Division terminals in Birmingham, but there is a UPS Service Center located in Trussville, Alabama ("the Trussville Terminal").  (*Id.* at 10.) The Trussville Terminal consists of a single structure surrounded by a yard where UPS trucks and vans are parked and serviced.  (*Id.* at 15-16.) The yard is enclosed by a barbed-wire topped fence with a gate.  (*Id.*) The Trussville Terminal is open twenty-four hours a day Monday through Friday.  (*Id.*)  The gate is only locked when the facility is closed on the weekends.  (*Id.* at 17; Doc. 24-9 at 5.) In his deposition testimony, Jones claims that the fence surrounding the Trussville Terminal is between fifty and seventy-five feet high (Doc. 24-2 at 32), while the manager of the Trussville Terminal, Keith Carter ("Carter"), testifies that it is only eight to nine feet. (Doc. 24-

---

[1]All citations to the record reference the document and page numbers as they appear on the court's electronic filing system.

9 at 9.)  Jones's recollection of the height of the fence makes it sound like a maximum security prison.  It would require steel posts five meters thick set in deep concrete to hold it up.  The court cannot help but wonder whether the gate is of the same height.

To report to work at the Fulton Terminal, Jones would drive his personal vehicle from his home in Birmingham to the Trussville Terminal, where his UPS flat-bed truck was regularly parked. (Doc. 24-2 at 14.)  Jones would then fuel his UPS truck before departing for the Fulton Terminal.  (*Id.* at 16.)  Upon arrival at the Fulton Terminal, Jones would receive his driving assignments from his manager, Sue Miles ("Miles").  (*Id.* at 12.)  Upon completing his deliveries for the week, Jones would drive his truck back to the Trussville Terminal, where he would park it and retrieve his personal vehicle.  (*Id.* at 17.)  When his delivery routes took him through Birmingham during the week, Jones would park his truck at the Trussville Terminal for the night and drive his personal vehicle home.  (*Id.* at 14.)  Jones visited the Trussville Terminal between two to four times during a typical week, but was not required to check in or out, or do any work at the Trussville Terminal.  (*Id.* at 16-17.)  Normally, Jones was at the Trussville Terminal only for the time that it took him to exchange vehicles.  (*Id.*)  There were no security cameras at the Trussville Terminal during the time Jones was employed.  (Doc. 24-9 at 7.)

The first possible incident of racial harassment occurred

3

during Jones's first week of employment in May, 2007.  (Doc. 24-2 at 13, 29-30.)  He was trained at the Fulton Terminal by a white fellow employee, Kenneth Terrell ("Terrell").  Jones alleges that during training, Terrell made a racially offensive comment, namely that he [Jones] "wasn't the first Indian he'd trained." (*Id.* at 30.)  Jones responded that he was not an Indian, to which Terrell replied  "it don't matter what you are, I trained your kind before." (*Id.*)  Whether Terrell was referring to East Indians or to American Indians, or was intending to insult Jones, is not reflected in the record.  Jones took it as a racial slur.

Jones says that another unidentified black employee at the Fulton Terminal told him that he had suffered similar treatment from Terrell.  (Doc. 24-2 at 46.)  This is, of course, inadmissible hearsay and cannot be taken as true for Rule 56 purposes.  Jones's conversation with Terrell was the only allegedly discriminatory incident relied upon by Jones and that occurred at the Fulton Terminal, Jones's work station.  It was nearly a year before it loomed up as a reason for Jones to depart as a result of an intolerable environment.

Shortly after the conversation with Terrell, Jones orally complained about it to Miles by telephone.  (*Id.* at 43.)  After hearing what Jones had to say, Miles asked him to submit a written complaint.  (*Id.*)  Miles said that they would discuss the incident when Jones returned to the Fulton Terminal.  (*Id.* at 30.)  Jones

4

never submitted a written complaint, and Miles never referred again to the incident. (*Id.* at 30, 43.)   After Jones's initial training week, he never saw Terrell again.   (*Id.* at 48.)   After Terrell trained him, Jones made all of his deliveries by himself. (*Id.* at 12-13.)   The pregnant fact is that the Terrell incident was never mentioned again by anybody until shortly before Jones's alleged constructive discharge.

Jones's next complaint of racially motivated conduct occurred almost a year later, on April 21, 2008, shortly before he quit.  On four occasions during April, 2008, upon arriving at the Trussville Terminal to pick up his assigned UPS truck, Jones found pieces of banana and/or banana peels on his truck's flatbed trailer. (*Id.* at 31-34.)   Jones never witnessed anyone putting the items there, but claims that the bananas were always found on the rear of the driver's side of the trailer, and that on at least one occasion, a banana peel was found on the driver's side steps to the cab. (*Id.* at 44, 32.)   Jones says that he first assumed that a Trussville Terminal employee inadvertently discarded the banana parts, but after the third instance, Jones became convinced that the items were intended to be an anti-black message. (*Id.* at 31-34.)   He never claims to have found such items on his personal vehicle.  He says he reached the conclusion that the bananas were a form of racial discrimination from his general life experience: "throughout . . . times you just hear so many discriminating words and things."

(Doc. 42-2 at 44.)    Jones does not claim that he heard any "discriminating words" from any UPS employee except Terrell, which was nearly a year before he quit.  Rather, the discrimination he experienced at UPS was "just in general. . . [j]ust living." (*Id.* at 45.)   When voicing complaints to managers, and during his deposition, Jones never indicated that he thought that the banana peels were left on his trailer to suggest that he was a "monkey." That interpretation was advanced for the first time by Jones's counsel in brief.  They are, perhaps, better at Aristotelian logic than their client is.

Jones claims that another unidentified black employee at the Trussville Terminal told him that white employees used racial slurs.  (*Id.* at 39.)   Again, this is classic hearsay and not admissible.

On April 21, 2008, the day that he found the third banana peel, Jones called Miles to complain and told her that he thought the bananas were racial messages.  (*Id.* at 31.)  Miles instructed Jones to talk with Carter about it, and also notified Kevin Martin ("Martin"), a UPS Human Resources Manager.  (*Id.* at 31-32; Doc. 24-8 at 3, 13.)   Upon hearing Jones's complaint, Carter opined that he did not believe that any Trussville Terminal employees were racists, citing as the basis for his belief the fact that the workforce was racially diverse and no similar complaints had been voiced by other blacks.  (Doc. 24-2 at 33.)  Carter suggested that

6

local children, who congregated at a bus stop located across the fence from where Jones parked his UPS truck, may have been throwing banana residue over the fence.  (*Id.* at 32; Doc. 24-7 at 15.) Jones was not satisfied with this explanation. He contends that the fence surrounding the Trussville Terminal was between fifty and seventy-five feet high and that the bananas were always inside the fence in the same place **(as supposedly also was the bus stop).** (Doc. 24-2 at 32.)  Martin suggested that Jones park his UPS truck in a different place.  (Doc. 24-2 at 34.)  Jones followed Martin's suggestion.  (*Id.*)  He found banana residue on his truck "maybe once" after he moved it and before he quit.  (Doc 24-2 at 34.)

While speaking to Carter about the bananas on April 21, 2008, Jones also mentioned that, earlier on that very day, he had seen "[p]robably three" UPS employees at the Trussville Terminal wearing clothing and accessories emblazoned with Confederate symbols. (Doc. 24-2 at 33.)  Jones could not identify the employees, but stated that they were white and worked as "yardmen," who changed tires and worked as vehicle mechanics.  (Doc. 24-2 at 35.)  April 21, 2008 is the only day on which Jones says that he observed UPS employees wearing Confederate symbols.  In other words, his complaints about bananas and Confederate regalia were expressed together.  Carter was surprised to hear Jones's accusation, and told him that employees were definitely instructed not to display such symbols at work.  (Doc. 24-2 at 34.)  Although Carter did not

investigate whether Jones's allegations were true, Jones never again saw any UPS employees displaying Confederate symbols. (Doc. 24-2 at 50.)

After parking his truck at the Trussville Terminal one evening, within a week after his complaint to Carter, Jones claims that he was approached by two of the yardmen whom he had seen wearing Confederate symbols. (Doc. 24-2 at 35.) One of them, who was holding a metal object, possibly a crowbar, said to Jones, "I thought we was friends." (*Id.* at 36.) The yardman next inquired as to why Jones would accuse him and his coworker of wearing Confederate apparel and putting bananas on Jones's truck. (*Id.*) Jones denied having complained about the Confederate apparel or the bananas, but said: "[I]f y'all are doing that, I don't think that's funny. I think that's mean." (*Id.*) The yardmen laughed, and looked at Jones "in a certain way" and walked away. (*Id.*) Jones says that he was scared and thought that his life was in danger. (*Id.*)

On April 23, 2008, the day after the conversation with the yardmen, Jones called Miles to report the new incident, and stated that he was considering resigning because he feared for his safety. (*Id.* at 36.) At Miles's request, Jones drove to the Fulton Terminal later that day so that they could contact UPS Human Resources and discuss the matter. (*Id.*) Upon arriving at Fulton, Miles and Jones had a conference call with Martin, and Miles

relayed Jones's version of the events at the Trussville Terminal. (*Id.* at 37.)   At the end of the call, Miles and Martin told Jones that they would get back in touch with him.  (*Id.*)  Before they did so, Jones quit.   Jones claims that neither Miles nor Martin requested that he provide a written statement about the April 22 events (*Id.* at 45), but Miles and Martin say that they did make such a request.  Toward the end of the conversation, Miles tried to talk Jones out of resigning. (*Id.* at 38.)

On April 28, 2008, Miles sent an e-mail that included attached photographs, taken by Carter, of the area of the Trussville Terminal in which Jones parked his UPS truck.  (Doc. 28-4.)  The body of the e-mail has been preserved and produced to Jones by UPS. (*Id.*)  However, by July 22, 2008, the date on which UPS received Jones's Charge of Discrimination from the EEOC, the images themselves could no longer be opened, because UPS only preserves this type of electronic data for forty five (45) days.  (Doc. 24-9 at 39.)   The importance or relevance of these photographs is undecided.  If they do not show a seventy five (75) foot fence, the court is nevertheless bound to take Jones's word for it under Rule 56.

On or about April 28, 2008, Jones resigned, giving a two-week notice. (*See* Doc. 28-3 at 3.)   Jones claims that he worked the entire two week period (Doc. 24-2 at 50), but UPS claims that he actually failed to report to work before the expiration of the two

weeks.   Taking Jones's version as true, he clearly showed up to work after he says he felt threatened.  Nothing further happened to him.  He was never formally terminated, and UPS never claimed that his performance was less than satisfactory.

On direct examination by his counsel, Jones testified that a Confederate flag flew over the Fulton Terminal in Mississippi for the entire year that he worked for UPS.  (Doc. 24-2 at 52.)  He never complained about it, and concedes that the UPS Terminal was located on property owned by Ferguson, the UPS customer. (*Id.* at 11.)   UPS presents the declaration of Richard Angle, a Fulton manager, that Ferguson  maintained a flag pole on which it flew the flag of the State of Mississippi.  (Doc. 24-1 ¶ 5.)   That flag incorporates the Confederate battle flag.  At no time did Ferguson fly the stars and bars as a separate flag.  (*Id.*)  Jones concedes this point by not disputing it in his response to UPS's motion for summary judgment.

Jones states that the treatment he received caused him mental anguish, including the stress attendant to his belief that his safety was in jeopardy.  (Doc. 24-2 at 24-25.)  Jones says that he felt unwanted after he made complaints, and finds himself more likely now to believe that people of other ethnicities are racist. (*Id.*)  No one at UPS told him he was unwanted.  He has not sought treatment from a mental-health professional, and does not claim that the injury has manifested itself in the form of any physical

symptoms.  (*Id.*)  In fact, Jones testified that, if his current business, which he owns, should begin to suffer, he "would like to take a job with [UPS]."  (*Id.* at 23.)  He has no out-of-pocket loss.  He is successfully self-employed.  Why would he even consider re-employment by an intolerably racist employer?

Jones devotes considerable energy complaining about how UPS reacted, or failed to react, to his complaints.  However, because Jones's treatment was not sufficiently severe and pervasive to constitute a hostile work environment, the court will not spend its time discussing the evidence that might bear on what UPS did or failed to do in response to Jones's complaints.

## DISCUSSION

Before getting to the merits of the Rule 56 motion, the court answers Jones's motion for sanctions for spoilation occasioned by UPS's destruction of the photographs depicting the area of the Trussville Terminal where Jones parked his truck.  (Doc. 29 at 12-13, 18.)  Rule 37(e) states that "[a]bsent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system."  Rule 37(e) F.R.Civ.P.  A party making a spoilation claim must establish that the destroyed evidence is relevant to a claim or defense and that its destruction resulted in prejudice.  *Eli Lilly and Co. v. Air Exp. Intern. USA,*

11

*Inc.*, 615 F.3d 1305, 1318 (11th Cir. 2010) (citing *Flury v. Daimler Chrysler Corp.,* 427 F.3d 939, 943 (11th Cir. 2005)).   Nothing before the court suggests bad faith on the part of UPS or prejudice to Jones.  For summary judgment purposes, the court accepts Jones's version of the facts, including his fence height as between fifty (50) and seventy five (75) feet, so that the lack of photographs is not prejudicial.   Spoilation sanctions are clearly not warranted.

**UPS's Rule 56 Motion**

Each of Jones's federal and state claims will be addressed sequentially.

## I.  Hostile Work Environment

To establish a hostile work environment, Jones must show that: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment so as to create a discriminatorily abusive work environment; and (5) his employer was responsible for the abusive environment.  *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002). Jones fails to establish all of these essential elements.

As to the third requirement, "[a]lthough we examine the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute racial harassment, the statements and conduct must be of a racial

nature before they are considered in determining whether the severe or pervasive requirement is met." *Robinson v. LaFarge North American, Inc.,* 240 Fed App'x 824, 829 (11th Cir, 2007) (internal punctuation omitted), quoting *Gupta v. Florida Board of Regents* 212 F.3d 571, 583 (11th Cir. 2000)(abrogated on other grounds). Jones insists the court must accept his interpretation of the incidents about which he complains, proving that they were racially motivated and constituted a hostile environment. This argument falls short. *Id.; see also Nettles v. LSG Sky Chefs,* 211 Fed. App'x 837, 839 (11th Cir. 2006) (affirming district court's grant of employer's motion for summary judgment where conduct employee complained of was not based on protected characteristic); *accord, Saunders v. Emory Healthcare,* 360 Fed. App'x 110, 117 (11th Cir. 2010) (per curiam); *Thompson v. Carrier Corp.,* 358 Fed. App'x (11th Cir. 2009) (per curiam); *Apodaca v. Sec'y of the Dep't of Homeland Sec.,*161 Fed. App'x 897 (11th Cir. 2006) (per curiam). If a court were required to accept the legal or ultimate conclusions of a party, the party would always win. The only incident that might be construed **directly** to reference Jones's race was his conversation with Terrell, during which Terrell incorrectly called Jones an "Indian" and said that he had "trained your kind before." This was an isolated, if arguably offensive, remark about which Jones did not file a written complaint, and which was not mentioned again for a year. Next, while the Confederate flag does not intrinsically

13

connote racism, federal courts, including at least two within the Eleventh Circuit, have held that the display of the Confederate flag can constitute racial discrimination for Title VII purposes. *See Barrow v. Ga. Pac. Corp.,* 114 Fed. App'x 54, 57 (11th Cir. 2005); *Carter v. Daehan Solutions Ala., LLC,* 2010 WL 431221 at *6 (M.D. Ala. Feb. 1, 2010); *see also Bishop v. Tyson Foods, Inc.,* 660 F.Supp. 2d 1004, (W.D. Ark. 2009); *Ellis v. CCA of Tenn., LLC,* 2010 WL 2605870 at * 11 (S.D. Ind. June 21, 2010).  The conversation between Jones and the two yardmen, nearly a year later, while not overtly racial, must considered together with the other possibly offensive conduct that preceded it by one day.

The presence of bananas on Jones's truck, without more, is not overtly racial.  Courts in the Eleventh Circuit have rightly found that referring to a black person as a "monkey" constitutes racial discrimination.  *E.g. Smith v. State of Fla. Dep't of Corr.,* 2009 WL 1490899 (M.D. Fla. May 27, 2009); *Mitchell v. Barnard Constr. Co., Inc.,* 2009 WL 3064769 (S.D. Fla. Sept. 22, 2009); *Davis v. Fla. Dept. Of Children and Family Serv.,* 2009 WL 3837872 (N.D. Fla. Sept. 30, 2009).  However, Jones's counsel is asking the court to make the conceptual leap to the conclusion that Jones's co-workers were calling him a monkey.  Despite Jones's counsel's reference to "racist bananas and banana peels" (Doc. 29 at 8), the court finds that there is nothing inherently racist about a banana, absent **direct** supporting evidence.

14

As recently as December 9, 2010, the Eleventh Circuit held:

> Direct evidence of discrimination is "evidence that, if believed, proves the existence of a fact without inference or presumption." Under Eleventh Circuit law, "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination."

*Dixon v. The Hallmark Companies, Inc.*, __ F.3d __, 2010 WL 4983663 at *3 (11th Cir. 2010)(internal citation omitted) (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004)). The use of the word "Indian" cannot be construed to be a blatant racist remark made with the intent of discriminating. For aught appearing, Jones looked like an Indian to Terrell.

This court has both made remarks that others found offensive, and has heard things that he found offensive. On occasion the remark may have been taken as an unforgivable insult, although it was not intended to hurt the hearer's feelings. People in the workplace are not required to have rhinoceros hides, but neither can they be so thin skinned that they take everything as a deliberate affront, threat, or racist remark. They must react as a reasonable person would under the same or similar circumstances. While the slipping hazard associated with banana peels may violate OSHA, the mere presence of bananas is not enough to trigger Title VII hostile workplace liability by an employer who is not shown to have directed or encouraged the occasional leaving of banana peels that might have been thrown over a high fence by school children.

15

As to the fourth requirement, severity and pervasiveness, Jones must satisfy both an objective and subjective component. *Miller,* 277 F.3d at 1276.   "Thus, to be actionable, [the harassment] must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive."   *Id.*   (internal quotations omitted).   Jones perceived his treatment **subjectively** as severe and pervasive.  But, in evaluating the degree of severity of the alleged harassment **objectively,** the court considers (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.   *Id.*   "Innocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or of the offended party . . . are not counted."   *Gupta,* 212 F.3d at 583.   Additionally, "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious), will not amount to discriminatory changes in the 'terms and conditions of employment'".  *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245 (11th Cir.1999) (*en banc*)(quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986).

Jones's falls short as to all of the said factors.   He complains of only three incidents that could possibly have been racially motivated: (1) the conversation in which Terrell called

16

him an "Indian" and stated that he had previously trained Jones's "kind"; (2) the occasion nearly a year later during which he observed Trussville Terminal employees wearing clothing incorporating Confederate symbols; and (3) the subsequent conversation with the two yardmen in which they inquired as to why he had reported them for displaying Confederate symbols.

Title VII is not a "general civility code" for the workplace. *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998). While the sporadic and infrequent conduct about which Jones complains during his year of employment may have been distasteful to him and less than laudable, it was more "boorish" or "childish" than the reprehensible and repeated misconduct that is precluded by Title VII.

The conversation with Terrell was a one-time occurrence. In fact, after Jones's first week of employment, the two never worked together again, or even saw one another. Terrell's statement was not physically threatening or unduly humiliating. It drew no formal or written complaint from Jones. The casual or "cute" remarks of a lower level co-employee do not suggest an inherent racist attitude by the employer. Jones did not resign until a year after Terrell's remarks.

Although not binding on this court, two courts within the Eleventh Circuit and elsewhere have found that employees' wearing of clothing festooned with the Confederate flag on an infrequent

basis does not create a proscribed hostile work environment. *Barrow,* 144 Fed. App'x at 57-58 (affirming grant of employer's motion for summary judgment where employees complained of sporadic instances in which Confederate flag decals and the letters "KKK" were displayed); *Daehan,* 2010 WL 431221 at *5-7 (granting employer's motion for summary judgment where employees complained of two co-workers wearing t-shirts and hats adorned with the Confederate flag when the employer thereafter instituted dress code forbidding such clothing and removed a Confederate flag sticker); *see also Ellis,* 2010 WL 2605870 at *11; *Bishop,* 660 F.Supp 2d at 1020-21.  In the instant case, Jones saw Confederate insignia only once, and after he complained about it, he never saw it again.  For summary judgment purposes, the court will overlook Jones's inability to differentiate the Confederate flag from the flag of Mississippi.  Not having argued the point, the court will assume that Jones no longer relies on flying the Mississippi flag in Mississippi.

Although arguably manifesting a degree of paranoia, Jones did **subjectively** perceive his conversation with the Trussville yardmen as intimidating and as physically threatening.  **Objectively**, there is no evidence to indicate that the yardmen actually threatened Jones, physically or vocally.  Indeed, the yardman began the conversation by saying "I thought we was friends."  Next, the yardman asked why Jones had reported them for wearing clothes that

had Confederate flags on them.  This was no more than a question,
if a question that could have been left unasked.  It should not
have been taken as a threat of bodily harm by a reasonable fellow
employee.  It was a complaint but not a threat.  Jones lied to his
fellow employees, denying reporting them to the boss and, to their
faces, accused them of leaving bananas on his UPS truck while
telling them he did not think it was funny.  This retort does not
sound like an intimidated or fearful person.  Jones says that the
yardman looked at him "in a certain way."  In what way?  Perhaps
they were disgusted at Jones's judgment of them.  One of the
yardmen held in his hand an unidentified metal object that could
have been a crowbar.  Jones does not testify that the yardman
raised or gestured with the unidentified metal object, or
threatened him with it.  Objectively, there was nothing physically
threatening about a yardman, whose job it is to change truck tires
and to perform other vehicle maintenance, to carry a tool.  A
reasonable person does not feel threatened while conversing with a
carpenter who holds a hammer, dangerous as a hammer can be, or with
a fireman who holds an axe.  The yardmen did not argue with Jones
when he denied reporting them, nor did they respond to his
accusation regarding the bananas unless by giving him a "certain
look."  Instead, the yardmen simply walked away.  The conversation
with the yardmen may have been unpleasant for Jones, as it may have
been for the yardmen, but, accepting Jones's version of it, there

was nothing **objectively** threatening or humiliating that would suddenly prove a pervasive work environment so hostile that he quit a week later.

It is well-established that a court considering a claim for hostile work environment cannot limit its analysis to each separate allegation in a vacuum.  Rather, the court must consider the totality of the circumstances.  *Mendoza,* 195 F.3d at 1246-47; *Miller,* 277 F.3d at 1276.  When considering all of Jones's complaints together, Jones has not demonstrated that his workplace was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [Jones's] employment and create an abusive working environment." *Harris,* 510 U.S. at 21 (internal punctuation and citations omitted).  The separate events about which Jones complains were not severe, frequent, threatening, or unduly humiliating, even in the aggregate.

Jones spent little time at the Trussville Terminal.  Assuming, *arguendo,* that the bananas were placed on Jones's truck because he is black, such an ambiguous fact fails to meet the severe and pervasive requirement of a hostile work environment.  If it had been a hangman's noose, it would call for a different response. Sloppy workmen leave banana peels in the workplace from time to time without intending to show racial animus.  A Title VII claim against an employer for a co-employee's stupid conduct, which a co-

20

employee may logically or illogically infer to be racist, is not the stuff that makes an actionable hostile work environment claim against the employer.

Last but not least, **there was no adverse effect on Jones's job performance**, one of the essentials to a *prima facie* case.  UPS had no complaint whatsoever about his performance, and in fact, begged him to stay.

## II.  Constructive Discharge

To succeed with his constructive discharge claim, Jones "must demonstrate that working conditions were 'so intolerable that a reasonable person in her position would have been compelled to resign.'" *Poole v. Country Club of Columbus, Inc.,* 129 F.3d 551, 553 (11th Cir. 1997)(quoting *Thomas v. Dillard Dep't Stores, Inc.,* 116 F.3d 1432, 1433-34 (11th Cir. 1997)).  Furthermore, a constructive discharge cannot occur when the employer is not given time within which to remedy an intolerable situation, if one exists.  *Kilgore v. Thompson & Brock Mgmt., Inc.,* 93 F.3d 752, 754 (11th Cir. 1996).  To prove constructive discharge, Jones "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Bryant v. Jones,* 575 F.3d 1281, 1298 (11th Cir. 2009).

The behavior which Jones contends compelled him to resign is the same behavior that forms the basis for his hostile work environment claim.  Because Jones's claim for hostile work

environment fails, his constructive discharge claim fails.

Jones cites *Poole* to support his constructive discharge claim. As UPS rightly contends, *Poole* is readily distinguishable. In *Poole,* the district court's grant of summary judgment in favor of the employer was reversed only because the employer stripped the employee of all job duties, moved her work station from an office to a chair with no desk, and subjected her to other humiliations. 129 F.3d at 552, 554. These acts clearly adversely affected her job performance. Jones neither alleges that his job duties were reduced, nor that his routine working conditions were altered. While Jones would have the court infer that he was physically threatened, and thus was compelled to resign, Jones was not treated so as to have any objective reason to resign. Furthermore, the very short time between Jones's last complaint and his resignation cannot be considered as enough time for UPS to have taken remedial measures satisfactory to Jones. Jones seemed hell-bent on resigning.

UPS's motion for summary judgment as to Jones's claim for constructive discharge will be granted.

## III.  State Law Claims

Federal courts hearing state law claims must apply the substantive law of the state in which they sit. *Erie Railroad v. Tompkins,* 304 U.S. 64 (1938). Accordingly, the court applies Alabama law to Jones's state law claims.

22

### A.  Outrage

Under Alabama common law, "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress." *Busby v. Truswal Systems Corp.,* 551 So.2d 322, 324 (Ala. 1989). The Alabama Supreme Court has held that "[i]n order for a plaintiff to recover, the conduct of the defendant must be 'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'" *Id.* (quoting *American Road Service Co. V. Inmon,* 394 So.2d 361 (Ala. 1981).  Finally, the plaintiff must suffer "emotional distress so severe that no reasonable person could be expected to endure it." *Jackson v. Ala. Power Co.,* 630 So.2d 439, 440 (Ala. 1993).

As stated, *supra,* some of the conduct relied upon by Jones is boorish.  However, the conduct does not rise to the level of despicability that constitutes the tort of outrage.  Jones has not demonstrated that he suffered severe emotional distress.  Jones describes his mental injuries as: (1) stress while working at UPS; (2) feeling "unwanted" at UPS after he made his complaints; and (3) being more likely to now believe that people of other ethnicities are racists.  This does not rise to the level of the unendurable mental anguish required for a *prima facie* case of outrage under

Alabama law.

UPS's motion for summary judgment will be granted as to Jones's claim for outrage.

**B. Negligent Hiring, Supervision, Training, Retention**

Jones's claim of negligent hiring, supervision, training, and retention fails because Alabama courts require proof of underlying wrongful conduct by some other employee or employees before the employer can be held vicariously liable under a tort theory of negligent hiring, supervision, training or retention. *Stevenson v. Precision Standard, Inc.,* 762 So.2d 820 (Ala. 1999); *Univ. Fed. Credit Union v. Grayson*, 878 So.2d 280, 291 (Ala. 2005); *Voyager Ins. Co. v. Whitson,* 867 So. 2d 1065, 1073 (Ala. 2003). Because Jones was neither the victim of actionable racial discrimination nor constructively discharged, there is no underlying co-employee wrong by which to hold UPS liable, much less to suggest that it negligently hired or failed to train its employees.

"In order to establish a claim against an employer for negligent supervision, training, and/or retention, the plaintiff must establish that the allegedly incompetent employee committed a common-law Alabama tort." *Thrasher v. Ivan Leonard Chevrolet, Inc.,* 195 F. Supp.2d 1314, 1320 (N.D. Ala. 2002); *see also Stevenson v. Precision Standard, Inc.,* 762 So.2d 820 (Ala. 1999). Alabama does not recognize a common-law tort for race discrimination. *Rabb v. Ga. Pac., LLC,* 2010 WL 2985575 (S.D. Ala.,

2010); *Thomas v. Utility Trailer Mfg. Co.,* 2006 WL 2480057, *3 (M.D. Ala. 2006).

Jones's negligence-based claims fail, and UPS's motion for summary judgment will be granted as to his claims of negligence.

## CONCLUSION

For the foregoing reasons, UPS's motion for summary judgment will be granted as to all of Jones's claims.  A separate order will be entered effectuating this opinion.

DONE this 30th day of December, 2010.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE