IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| REGINALD JONES, | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | 2:09-cv-01321-WMA |
| | } | |
| UPS GROUND FREIGHT, INC., | } | |
| | } | |
| Defendant. | } | |
| | } | |

**MEMORANDUM OPINION AND ORDER**

Reginald Jones ("Jones") brought this action against UPS Ground Freight, Inc. ("UPS"), his former employer, alleging, *inter alia*,[1] that he had been subjected to a racially hostile work environment in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2. This court entered summary judgment in favor of UPS, (Doc. 31). Jones timely appealed. (Doc. 34). Upon review, the Eleventh Circuit reversed this court as to Jones's hostile work environment claim,[2] holding that "a reasonable trier of fact could conclude that the events alleged by [] Jones created an objectively hostile work environment." *Jones v. UPS Ground Freight, Inc.*, 683 F.3d 1283,

---

[1] Jones also brought claims for constructive discharge and state law intentional infliction of emotional distress and negligent hiring, supervision, training, and retention.

[2] This court granted summary judgment as to all claims contained in Jones's complaint. On appeal, Jones expressly abandoned his claims for constructive discharge and state law intentional infliction of emotional distress and negligent hiring, supervision, training, and retention.

1287 (11th Cir. 2012).  That the existence or non-existence of a racially hostile work environment is a jury issue has become the law of the case.  Along with vacating this court's judgment, the Eleventh Circuit remanded the case for further proceedings, specifically instructing this court to address the issue of whether UPS took "prompt remedial action" once it had notice of the allegedly harassing conduct.  *Id.* at 1287, 1304.  The Eleventh Circuit, based on the record, could have provided an answer to the question this court did not adequately address, but instead remanded the case to give this court a shot at it.  In compliance with the Eleventh Circuit's mandate, this court issued an order instructing UPS, if it so desired, to file a supplemental brief addressing prompt remedial action and providing Jones, if he so desired, an opportunity to respond.  (Doc. 37).

UPS has not asserted and does not now expressly interpose the *Faragher/Ellerth* affirmative defense, which is often referred to as the defense of "prompt remedial action."  *See generally*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257 (1998).  Instead, UPS contends that Jones has failed to establish the fifth element of a hostile work environment claim because he has not provided a basis to hold UPS liable for the conduct of non-supervisory personnel when UPS took appropriate remedial action.

BACKGROUND[3]

UPS is in the business of transporting commodities by motor carrier.  Jones, who is an African-American, began working for UPS as a road driver trainee on May 1, 2007.  After one week of training, he became a road driver in the Truckload Division, a position he held until he resigned.  As a road driver, Jones drove alone on assigned trips.

Although Jones lived in Birmingham, Alabama, he was dispatched on his trips from UPS's terminal in Fulton, Mississippi ("Fulton Terminal").  The Fulton Terminal ships goods for a plumbing hardware manufacturer, Ferguson Enterprises ("Ferguson"), and is located on Ferguson owned property.  Approximately twice a week, Jones would drive his UPS truck to the Fulton Terminal to pick up Ferguson goods for transit and delivery.  Jones's visits to the Fulton Terminal were usually brief.  His trailer would be loaded and he would go in, get paperwork, and leave.  Sue Miles ("Miles") managed the Fulton Terminal and was Jones's direct supervisor.  The Fulton Terminal does not have an on-premises human resource department.  Such matters are handled generally at UPS's headquarters in Richmond, Virginia.

Because Jones lived in Birmingham, Alabama, he was permitted to park his UPS truck at a UPS service center near Birmingham,

---

[3] Because of the procedural posture, all facts and their reasonable inferences are viewed in the light most favorable to Jones.

Alabama, known as the Trussville Terminal.  He was not employed there.  Keith Carter ("Carter") was the manager of the Trussville Terminal.  The Trussville Terminal consisted of a building, a parking lot for general business traffic, and a yard for truck parking.  The truck yard is located behind the building and is enclosed by a barbed-wire fence.  Only UPS employees are allowed inside the yard, but it is open to these employees around the clock during the work week.  The Trussville Terminal is a service center for Less-than-Truckload Division of UPS and does not conduct any Truckload Division operations.  These two divisions are managed separately and are supported by different Human Resources personnel.

When Jones arrived at the Trussville Terminal to pick up his UPS truck, he would park his personal vehicle in the general parking lot located in front of the building and walk to the yard behind the building where his UPS truck was parked.  He would fuel his truck at the Trussville Termination before leaving.  Upon his return, Jones would park the UPS truck in the yard and walk back to his personal vehicle.  Jones was not required to do anything at the Trussville Terminal.  He estimates that he was at the Trussville Terminal for a short period of time one or two days a week.

**Jones's Allegations of Racial Harassment and Complaints**

As the basis of his hostile work environment claim, Jones cites several incidents of alleged racial harassment.

4

<u>Alleged Harassment at Fulton Terminal</u>

The first incident that Jones perceived as racial harassment occurred during his road driver training.  This week-long training was conducted by Kenneth Terrell ("Terrell"), another UPS driver.  Terrell is Caucasian.  While on a training run, Terrell told Jones, "I know how to train you Indians."  When Jones responded that he was not Indian, Terrell said "I don't care what race you are, I trained your kind before."  Terrell used the term Indian more than once during this conversation, but made no other comments that Jones perceived to be of a racial nature.

Jones contends that during training he called Miles, his supervisor, to tell her that Terrell had made racially derogatory comments.  Miles told Jones that she had written notes on his complaints and  that she would talk to him and Terrell when they returned.  Miles also asked Jones to submit a written statement of what happened.  Jones never submitted a written statement.  Upon his return to the Fulton Terminal, Miles did not discuss this matter with Jones.  Miles disputes Jones's version of events.  Miles testified at her deposition that she did not learn of the racial nature of this incident until she was questioned about it at her deposition.  Instead, Miles testified, she had heard from another employee that Jones had experienced some issues with Terrell, but Jones would not tell her the nature of those issues when she inquired.  Regardless of when UPS management learned of

5

the racial nature of Terrell's comments, Jones testified at his deposition that Terrell's remarks were the only racially-based comments made to him throughout his year-long employment with UPS. In other words it could not have been pervasive until shortly before Jones quit.

<u>Alleged Harassment at Trussville Terminal</u>

On April 21, 2008, approximately eleven months after the Terrell comments, Jones complained to Miles after finding remnants of bananas, bananas that had been broken in half and banana peels, on his UPS truck in the yard at the Trussville Terminal.  The employees in the yard were white.  According to Jones, the banana remnants were always located in one of two places, either on the back of the truck's flatbed trailer or on the steps up to the cab. Jones never saw bananas on any other truck, nor is there evidence that he found other refuse on his truck.  Because he didn't think much of this at first, Jones did not report the problem to Miles or human resources personnel.  After finding the banana refuse for approximately the third time, Jones called Miles to report it. There is no indication, and Jones does not contend, that UPS had any reason to know of these incidents before April 21, 2008.  Miles instructed Jones to speak with the manager of the Trussville Terminal about the matter.  Because neither the Trussville Terminal nor the Fulton Terminal had an on-site human resources department, Miles emailed Kevin Martin ("Martin"), the Human Resources Manager

6

for the UPS Truckload Division, in Richmond, Virginia about the complaint.

As Miles had directed, Jones told Carter, whom he had not met previously, that he had been finding banana refuse on his truck and that he believed it was racially motivated.  Carter explained that UPS policy prohibited discrimination or harassment based on race and that he did not believe that anyone at the Trussville Terminal was racist.  Carter also suggested that the banana refuse may have come from children throwing trash over the fence.  In response, Jones explained that he did not believe that such was the case because he always found the bananas and banana peels in the same two places on his truck.  Carter recommended that Jones park his truck in a different part of the lot to see if this would solve the problem.

During this conversation, Jones told Carter that there appeared to be racism at the Trussville Terminal because he saw white employees wearing shirts and hats with Confederate insignia. Carter explained that he was aware of that happening in the past, but that the employees had been told that such apparel was not permitted and he had not heard of or seen it since.  Carter testified at his deposition that he does not recall Jones ever mentioning that other employees had been wearing clothing with Confederate insignia.  There is no evidence that such an accusation was ever investigated by UPS.  Regardless, after Jones's complaint,

Jones testified that he never witnessed any employee at the Trussville Terminal wearing Confederate insignia.

After his conversation with Jones, Carter asked another supervisor at the Trussville Terminal, Tim Jacks, if he had noticed anything or anybody in the area around Jones's truck.  Carter did not question anyone else about the banana refuse, including Jimmy Shell, the yard jockey whom he believed to be the only person with access to the yard during the time period in question.  Jones also contends that Carter did question at least one employee who Jones believes had worn clothing with Confederate insignia in the past.  In other words, Jones is stuck with this concession.

A few days after Jones first reported the alleged harassment to Carter, an incident occurred between Jones and two other employees at the Trussville Terminal.  Two men that Jones had seen wearing Confederate insignia in the past approached him after dark and asked why he had told management that they had been wearing Confederate insignia and putting the banana refuse on his truck.  Jones was nervous especially when one of the two was holding a crowbar or something similar in his hand.  Jones answered that he had not said anything to management, because, as he understood it, his conversation with Carter was supposed to be confidential.  Jones told the men if they had done something like put bananas on his truck, that it wasn't funny.  And, according to Jones, the men laughed, looked at him a "certain way," and then walked away.

Jones testified that the next morning, which was sometime between April 22 and 24, 2008, he called Miles and told her about the incident with the other employees and that he was thinking about quitting. Miles encouraged him not to resign and instructed him to come into her office at the Fulton Terminal so she could contact Martin, the Human Resources manager in Virginia. Miles, however, testified that Jones never told her about the encounter in the Trussville yard and that she did not know about it until after Jones left UPS. Instead, Miles contends that the sole purpose of the conference call was to address Jones's complaints about the banana refuse. Martin, who was also on the call, also testified that the only purpose of the call was to discuss the banana refuse on Jones's truck. Both Jones and Miles agree that Miles told Jones to come to the Fulton Terminal for a conference call and that Jones did there after go to the Fulton Terminal and participate in a call with Miles and Martin.

The parties' recollections of the details of the conference call are vague. Miles remembers only that she and Martin asked Jones to provide a written statement of what had occurred. Martin also recalls that part of the reason they asked for a written statement was that Jones had provided no specific information about the incident during the call. Jones, however, does not remember being asked to submit a written statement. He does recall relaying

9

his complaints about the banana refuse and the Confederate insignia to Martin, but there is no indication that the nighttime encounter at the Trussville Terminal was discussed during the call.   Jones also remembers that Martin ended the call by saying that he was out of town on business, but would be returning in two days, that he would start an investigation as soon as possible, and that he would keep in touch.

Jones found banana refuse on his truck once after the conference call.   Miles emailed Martin to inform him about this incident on April 28, 2008, which suggests that Jones found the new banana refuse on this day or the day before.   In a separate email that day, Miles informed Martin that Jones had given his two week notice.   Jones testified that he did not resign on the same day he made this last complaint, and the precise date Jones resigned is not apparent from the record.   The parties disagree on whether Jones worked the entire two weeks of his notice period, but agree that his last day of employment was sometime in May 2008.

## DISCUSSION

To prevail on a claim of racial harassment based on a hostile work environment under Title VII and/or § 1981, Jones must prove that (1) he belongs to a protected group; (2) he has been subject to unwelcome harassment; (3) the harassment must have been based on a protected characteristic; (4)the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment

10

and create a discriminatorily abusive work environment; and (5) *his employer is responsible for such environment under a theory of vicarious liability or direct liability*.   *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).  Only the fifth prong of *Miller*, employer liability, is at issue on remand. Although the Eleventh Circuit did determine that there are jury questions based on the third and fourth prongs of *Miller*, the court has held that "[s]ummary judgment [may still be] warranted based on the absence of employer liability . . . which is the fifth and final requirement of a [hostile work environment claim]." *Lockett v. Choice Hotels Int'l, Inc.*, No. 08-13998, 2009 WL 468298, *5 (11th Cir. Feb. 26, 2009).

To establish employer liability when the perpetrator of the harassment is a co-employee of the victim and not a supervisor, the plaintiff-employee must present evidence that the employer knew or should have known of the harassment *but failed to take prompt remedial action*.  *Miller*, 277 F.3d at 1278 (citing *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000)).  There is no dispute that UPS knew of the alleged harassment.  UPS contends that it is entitled to summary judgment because Jones cannot establish that UPS failed to take prompt remedial action once it knew of the alleged harassment.

An employer takes prompt remedial action if it acts reasonably to correct the alleged harassment by responding "appropriately and

11

with celerity." *Dinkins v. Charoen Pokphand USA, Inc.*, 133 F. Supp. 2d 1237, 1253 (M.D. Ala. 2001); *Miller*, 277 F.3d at 1280 (requiring "immediate and appropriate" remedial action).   The remedial measures should be designed to stop the harassment, correct its effects, and ensure that it does not reoccur. *Dinkins*, 133 F. Supp. 2d at 1253.   Remedial measure do not need to be those that the employee requests or prefers, so long as they are designed to be effective.   *Id*.   In other words, "prompt remedial action" need not consist of termination or other severe discipline of the offending fellow employees.

It is undisputed that UPS had actual notice of the allegedly harassing conduct on April 21, 2008, when Jones first reported the banana refuse to Miles.   There is no evidence to indicate, and Jones does not contend, that there was any reason for UPS to have constructive or actual notice before this date.   It is also clear from the record that Jones submitted his resignation on or before April 28, 2011, not more than one week after his initial complaint. Thus, to establish employer liability, Jones must present evidence that during this one week window, UPS failed to take, or at least to begin to take, the requisite prompt remedial action.

Jones does not argue that UPS failed to take prompt remedial action following his 2007 complaint regarding comments made by

Terrell during his training.[4]  Instead, Jones's arguments focus on UPS's alleged failure adequately to respond to his complaints regarding the banana refuse, Confederate insignia, and the confrontation at the Trussville Terminal.  Specially, Jones contends that UPS did nothing to stop the harassment or to ensure that it did not reoccur because the harassment continued with additional banana refuse on his truck and escalated to the confrontation at the Trussville Terminal.

Based on the undisputed evidence, Jones's contention that UPS "did nothing to stop the harassment or ensure it did not reoccur" is an overstatement.  UPS certainly took some remedial action by initiating an investigation into Jones's complaints.  Unlike some instances of workplace harassment, neither UPS nor Jones knew the identity of the individual or individuals who allegedly placed banana refuse on Jones's truck.  *See Washington v. Kroger Co.*, No. 05-16328, 2007 WL 433519, at *1, 3 (11th Cir. Feb. 8, 2011) (holding that there was prompt remedial action when the employer removed the offending object and censured the perpetrator).  UPS could not have taken action to stop the harassment or to censure

---

[4] Jones has not offered any evidence to indicate that UPS failed to take prompt remedial action in response to Terrell's comments.  According to Jones, when he reported the incident to Miles, she took notes and asked him to submit a written statement.  Jones never submitted a written statement.  Furthermore, Jones testified that Terrell's remarks were the only racially-based comments made to him throughout his employment with UPS.

the perpetrator without first acquiring knowledge of the perpetrator's identity. In order to do so, UPS needed to gather information from Jones and other employees to determine who was responsible and how to stop the offensive conduct.

In response to Jones's complaints of harassment, UPS assured Jones that it would investigate his concerns and took steps towards gathering information and initiating an investigation. After Jones's first complaint about banana refuse, his supervisor, Miles, contacted Martin, the human resources manager, about the incident and instructed Jones to talk to Carter, the manager of the Trussville Terminal where the incident occurred. Jones discussed the matter with Carter, and Carter questioned another supervisor at the Trussville Terminal about the incident. Carter also asked Jones to park his truck in a different location in the yard so that they could determine if the banana refuse was a result of parking near the barbed-wire fence. Additionally, a few days later Jones, Miles, and Martin participated in a conference call to address this issue.[5] Jones resigned only a few days after this call, one week after his initial complaint.

UPS contends that it did respond promptly and appropriately to Jones's complaint, whereas Jones did not provide it with the time

---

[5] The parties dispute whether the purpose of this conference call was also to address the encounter between Jones and two white employees at the Trussville Terminal. There is no dispute, however, that at least one purpose of this call was to address Jones's complaints about the banana refuse.

to respond to his complaints because of his hurried resignation after finding other employment.  He does not claim constructive discharge.  Jones argues that UPS's argument "shamefully" points the finger at him by contending that he did not provide it with adequate time to respond appropriately to his complaints.  Jones argues that UPS was required to take *immediate* action, which he argues it failed to do.

Jones's argument that the court should essentially ignore the undisputed fact that only one week elapsed between Jones's initial complaint and his resignation to avoid "pointing the finger at the victim" is misplaced.  This court does not "point the finger at the victim," but instead only acknowledges the undisputable time frame in which these events occurred.  Because it is apparent from the record that UPS began to take action to investigate toward remedying the alleged harassment, this court must determine whether, within a week, UPS's efforts were sufficiently immediate and reasonably directed toward an effective and fair result to warrant summary judgment on the issue of direct employer liability. Based on the evidence presented, although UPS had begun to take some remedial action, a reasonably jury could conclude that UPS failed to take prompt remedial action in response to Jones's complaints of racial harassment.  This is what this court reads between the lines of the Eleventh Circuit's opinion.

Although Jones's first reported the banana refuse to Miles on

April 21, 2008, UPS management did little thereafter actually to stop the harassment or ensure that it did not reoccur.  During this time, Miles sent one email to Martin and instructed Jones to talk to Carter.  During Jones's conversation with Carter, Carter simply asked Jones to park his truck in a different location to see if the banana refuse was related to the location of his truck.  Carter also asked one supervisor about the incident, but failed to talk to other employees, particularly those who would have been in the yard at times when the banana refuse could have been placed.  The Eleventh Circuit found, in effect, that the bananas should have caused any employer to check the "race" angle and react properly to it.

Even after the conference call, which was held after Jones contacted Miles to report the encounter in the yard at the Trussville Terminal,[6] UPS took no action to prevent further harassment.  Martin testified that other than having these conversations, he did nothing to investigate Jones's complaints or begin implementing a response.  While it cannot be disputed that some investigation and coordination was necessary, a reasonable jury might be able to find that the steps taken by UPS were not sufficiently immediate and were not reasonably calculated to stop the harassment and to ensure that it did not reoccur.  Or UPS's

---

[6] The parties dispute whether UPS had knowledge of the encounter at the Trussville Terminal before Jones's resignation.

anticipated Rule 50 motion might be granted after all the evidence is presented.

UPS is not entitled to summary judgment because there are disputed issues of material fact. Specifically, the parties dispute whether UPS had knowledge of the encounter between Jones and two white employees in the yard at the Trussville Terminal. According to Jones, the morning after the encounter, he called Miles and told her about the incident. Miles, however, testified that Jones never told her about the encounter and that she did not know about it until after Jones had precipitously left UPS. If UPS knew about this allegedly racially-motivated encounter before Jones resigned, it would be obligated to take prompt remedial action, whatever that is determined to be, either as a matter of law or by a jury. The required response to this alleged escalation in harassment would undoubtedly be different than that required to address the banana refuse. Such disputed issues of material fact preclude summary judgment.

## CONCLUSION

For the foregoing reasons, UPS's motion for summary judgment is **DENIED**. Pretrial conference is **SET** for **November 1, 2012** at **10:30 A.M.**, in accordance with the accompanying pre-trial instructions, unless the parties, **prior to October 26, 2012**, request mediation, a course of action this court strongly recommends.

17

DONE this 19th day of September, 2012.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE